## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BERNARD LOCKHART-BEILKE, | Civil No.  13-1208 (JRT/BRT) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| JEFFREY PETERSON, RICK PUNG, ZACH GAHM, ROGER BABURAM, and ALL HEARINGS AND RELEASE OFFICERS FOR THE HEARING AND RELEASE UNIT, | |
| Defendants. | |

A.L. Brown, **CAPITOL CITY LAW GROUP, LLC**, 413 Wacouta Street, Suite 140, Saint Paul, MN  55101, for plaintiff.

Scott A. Grosskreutz, Assistant Attorney General, **OFFICE OF THE MINNESOTA ATTORNEY GENERAL**, 445 Minnesota Street, Suite 900, Saint Paul, MN  55101, for defendants.

Plaintiff Bernard Lockhart-Beilke ("Lockhart-Beilke") was sentenced for criminal sexual conduct and received an executed sentence of thirty-eight months, to be served partially in prison and partially on supervised release.  He was also given a mandatory ten-year conditional release term.  The executed sentence was scheduled to end in September 2010.  In October 2010, after his executed sentence had ended, Lockhart-Beilke's release was revoked for misconduct he likely committed mostly or entirely during his supervised release term.  Nevertheless, he was given years of additional prison time during what was his conditional release term.

Although Minnesota case law formerly allowed this sort of practice, two recent Minnesota Court of Appeals decisions have stated that an offender cannot be forced to serve time during his conditional release term for misconduct committed during a supervised release term. Lockhart-Beilke was held in prison for almost three years after his release was revoked and now brings this action against the Minnesota Department of Corrections' ("DOC") Hearings and Release Unit ("HRU") officers ("defendants"), alleging that he was unlawfully incarcerated in violation of his constitutional rights, and that he was falsely imprisoned in violation of state law. The defendants now move for summary judgment. Because qualified immunity protects the defendants from suit, the Court will grant the defendants' motion as to the federal law claims. In the absence of any remaining federal law claims, the Court will decline to exercise supplemental jurisdiction over the state law claims.

## BACKGROUND

On August 5, 2008, Lockhart-Beilke was adjudicated guilty of fourth-degree criminal sexual conduct, a felony, in Dakota County, Minnesota. (Aff. of Patrick Courtney ("Courtney Aff.") ¶ 30, Oct. 1, 2014, Docket No. 30; *id.*, Ex. 6 at Peterson 0719)[1]; *see also* Minn. Stat. § 609.345. The court imposed an executed sentence of thirty-eight months, along with a ten-year period of conditional release. (Courtney Aff. ¶ 30.) Lockhart-Beilke received a credit of 396 days, however, for time already served.

---

[1] All page numbers refer to the CM/ECF pagination unless otherwise noted. Citations to the Courtney Affidavit exhibits will use the Bates numbering pagination "Peterson ___."

(*Id.*)  Before delving into Lockhart-Beilke's allegations, it is necessary to discuss how the DOC administers sentences and to summarize recent relevant state case law.[2]

## I.   EXECUTED SENTENCES IN MINNESOTA AND SUPERVISED RELEASE

An executed sentence in Minnesota consists of two parts: "(1) a specified minimum term of imprisonment that is equal to two-thirds of the executed sentence; and (2) a specified maximum supervised release term that is equal to one-third of the executed sentence."  Minn. Stat. § 244.101, subd. 1.  "[T]he amount of time the defendant actually serves in prison may be extended by the commissioner if the defendant commits any disciplinary offenses in prison."  *Id.* at subd. 2.  Indeed, a defendant could serve his entire executed sentence term in prison.  *Id.*

The DOC labels "the date of an offender's initial release from prison" a supervised release date ("SRD").  (Courtney Aff. ¶ 4.)  Following his SRD, as noted above, a defendant serves the remainder of his executed sentence on supervised release, also known as parole.  (Decl. of Jeffrey Peterson ("Peterson Decl.") ¶¶ 8-9, Oct. 1, 2014, Docket No. 27.)  If an offender violates the terms of his release, the relevant corrections agent contacts the HRU and generally recommends either (1) a restructured release,

---

[2] The most relevant DOC office in this case is the DOC's HRU.  The HRU was led by defendant Jeffrey Peterson from 1997 until August 1, 2014.  (Decl. of Jeffrey Peterson ("Peterson Decl.") ¶ 1, Oct. 1, 2014, Docket No. 27.)  The HRU generally has nine hearing officer positions, along with additional administrative support staff, and those hearing officers perform a variety of duties relevant to this case.  (*Id.* ¶ 2.)  All three other named defendants, Richard ("Rick") Pung, Zachary Gahm, and Roger Baburam, were hearing officers with the HRU, under the supervision of Peterson, during the relevant time period.  (*See* Aff. of Richard S. Pung ("Pung Aff."), Oct. 1, 2014, Docket No. 28; Aff. of Zachary Gahm ("Gahm Aff."), Oct. 1, 2014, Docket No. 29; Aff. of Roger J. Baburam ("Baburam Aff."), Oct. 1, 2014, Docket No. 31.)

whereby the offender remains in the community under revised conditions; or (2) a revocation of release and return to prison. (*Id.* ¶ 9.) The offender is arrested and an HRU hearing officer conducts a revocation hearing at the jail. (*Id.*; *see also id.*, Ex. 1 (Evidentiary Hearings Policy).) Hearing officers make factual findings at the hearing and, at the disposition phase of the hearing, decide whether the release should be revoked and whether the offender should return to prison. (*Id.* ¶¶ 9-11.) If an offender disagrees with the hearing officer's decision, he may appeal to the head of the HRU. (*Id.* ¶ 11.) Hearing officers make complex decisions throughout the parole revocation process but, according to Peterson, they rely on attorneys in the DOC's Policy and Legal Services division for information regarding new laws or judicial decisions. (*Id.* ¶ 12.)

If an offender is sent back to prison (called "accountability time"), he does not receive a new SRD. (*Id.* ¶ 13.) Instead, the offender receives a projected release date ("PRD"). (*Id.*) Unlike the SRD, which is a guaranteed date of release, the "PRD is subject to change based on the offender's behavior . . . and his compliance with any directives imposed by the hearing officer." (*Id.*) The offender has regular meetings, called review hearings, at which a hearing officer considers whether his PRD should be extended further. (*Id.* ¶ 14.)

Throughout this process, hearing officers do not carry an offender-specific caseload and instead hear cases as they arise. (*Id.* ¶ 3.) Moreover, the hearings officers do not actually calculate the offenders' sentences, or their exact SRDs or PRDs. (*Id.* ¶¶ 6, 13.) Instead, staff at the DOC's Records and Sentence Administration unit ("records unit") completes those calculations. (*Id.* ¶ 13; Courtney Aff. ¶ 3.)

## II.    CONDITIONAL RELEASE

At the time Lockhart-Beilke committed his crime and was sentenced, Minnesota law required the DOC to place an offender, who was guilty of criminal sexual conduct, "on conditional release for ten years, minus the time the offender served on supervised release."  Minn. Stat. § 609.3455, subd. 6 (2005).[3]  Conditional release and supervised release are functionally the same: "an offender resides in the community, subject to compliance with a list of release conditions and to reincarceration for violating release conditions."  (Peterson Decl. ¶ 15.)

Based on the prior version of the relevant statute and past caselaw, the DOC's long-time understanding was that "supervised release terms and conditional-release terms ran concurrently."  (*Id.*; *see also* Courtney Aff. ¶ 11); *see also State v. Koperski*, 611 N.W.2d 569, 572 (Minn. Ct. App. 2000) (interpreting a similar, earlier version of Section 609.3455 (then labeled Minn. Stat. § 609.109, subd. 7), which contained similar language subtracting from the conditional release term any time spent on supervised release, and stating that "[t]here is no doubt that the intent of the legislature was for conditional release and supervised release to run concurrently once the defendant is released from prison"); *State v. Enger*, 539 N.W.2d 259, 263-64 & n.1 (Minn. Ct. App. 1995).  The effect of this understanding, in Peterson's words, was that "when a hearing officer revoked an offender's release, the revocation could extend through expiration of the offender's conditional-release term."  (Peterson Decl. ¶ 15.)  In other words, if an

---

[3] The current statute directs the DOC to place an offender, who committed criminal sexual conduct, "on conditional release for ten years."  Minn. Stat. § 609.3455, subd. 6 (2014).

offender's release was revoked during his period of supervised release, prior to his SRD, his accountability time in prison could run beyond his SRD (and the corresponding end to his executed sentence) and instead run through the end of his concurrently running conditional release term.   (*Id.*)   Once an offender, serving accountability time, went beyond his SRD, the SRD date disappeared from his file in the Correctional Operational Management System ("COMS") and the end of his sentence was the same as the end of his conditional release term.   (Courtney Aff. ¶ 12.)

## A.     *Peterson v. Fabian*

In a 2010 decision, the Minnesota Court of Appeals appeared to reverse course, at least in certain statutory contexts.   *Peterson v. Fabian*, 784 N.W.2d 843 (Minn. Ct. App. 2010).   In that case, an offender was sentenced to one year and one day for failing to register as a predatory offender, along with a ten-year conditional release term under Minn. Stat. § 243.166, subd. 5a.   *Id.* at 844-45.   The statute directs the DOC to place a person who fails to register "on conditional release for ten years."   Minn. Stat. § 243.166, subd. 5a.   The statute does not contain a provision that subtracts from the conditional release term any time spent on supervised release.   *Id.*   While on supervised release, the defendant in *Peterson* violated the terms of his release and was sentenced to 250 days of incarceration, which went beyond the end of his executed sentence term and into the ten-year conditional release term.   *Peterson*, 784 N.W.2d at 844.   The defendant's release date was extended even further, by another 180 days.   *Id.* at 845.   The defendant challenged his incarceration via a habeas petition and the Minnesota Court of Appeals

held in his favor.  *Id.* at 845-48.  The court concluded that a conditional release term under Section 243.166 for failure to register "is consecutive to a supervised-release term."  *Id.* at 846.  Consequently, when the defendant was reincarcerated following the revocation of his supervised release, that reincarceration could only last as long as his executed sentence (i.e., to the end of his supervised release term), not through the end of his conditional release term.  *Id.* at 845 ("[The defendant] argues that conditional release is consecutive to supervised release and that the extension of his incarceration beyond the completion of his sentence, based on a supervised-release violation, is unlawful.").

The court derived this ruling from the plain language of Section 243.166, subd. 5a, which states "that 'the court shall provide that **after** the person has completed the **sentence** imposed, the commissioner shall place the person on conditional release for ten years.'"  *Id.* at 846 (emphasis added) (quoting Minn. Stat. § 243.166, subd. 5a (2005)).[4] In reaching its conclusion, the court squarely rejected the defendant's argument, relying on a comparison of Section 243.166, subd. 5a and Section 609.3455, subd. 6, that the two release terms in Section 243.166, subd. 5a run consecutively because that provision does not contain the language, "minus the time the offender served on supervised release."  *Id.* at 846 (internal quotation marks omitted); *see also State v. Schnagl*, No. A13-1332, 2013 WL 6152348, at *3-*4 (Minn. Ct. App. Nov. 25, 2013) (discussing the *Peterson* decision), *aff'd as modified by* 859 N.W.2d 297 (Minn. 2015) (affirming the Court of

---

[4] Section 609.3455 contained similar language: "[T]he court shall provide that, **after** the offender has completed the **sentence** imposed, the commissioner shall place the offender on conditional release for ten years, minus the time the offender served on supervised release." Minn. Stat. § 609.3455, subd. 6 (2005) (emphasis added).

Appeals decision on the grounds that the defendant had not used the proper procedure to obtain judicial review of the DOC's administration of the sentence imposed; not reaching the merits of the defendant's motion).  The court concluded that the subtraction language in Section 609.3455, subd. 6 "merely directs a court to credit against a conditional-release term a person's time spent on supervised release." *Peterson*, 784 N.W.2d at 846.

The court criticized its earlier decision in *Koperski*, calling into question that case's claim that a conditional release period and supervised release period must run concurrently.  *Id.* at 847.  The court noted that the statute at issue in *Koperski*, like its modern version, Section 609.3455, subd. 6, did not use the term "concurrently" at all.  *Id.* The court also noted, however, that the issue in *Koperski* was different than the issue in the *Peterson* case.  *Id.* ("But unlike in *Enger* and *Koperski*, the issue here is not whether Peterson is entitled to credit against his conditional-release term for time served on supervised release; the issue is the time at which the conditional-release term begins.").

The day the *Peterson* decision was released, an attorney at the DOC's Policy and Legal Services division, Krista Fink, alerted the HRU, via Peterson, to the new decision. (Peterson Decl. ¶ 16.)  She indicated that the decision applied to a small number of offenders; namely, offenders "convicted for failing to register as level-III predatory offenders" under Minn. Stat. § 243.166.  (*Id.*; *id.*, Ex. 3 (Fink e-mail) at Peterson 2151.)[5] Fink followed up with a memo to the HRU on August 5, 2010.  (*Id.*, Ex. 3 (Fink Mem.) at Peterson 3240-41 ("This change does not implicate new parameters when revoking

---

[5] References to Peterson Declaration exhibits will use the Bates numbering pagination "Peterson ___".

release for offenders on conditional release pursuant to other statutes.").)  Peterson states that he likely heard the same interpretation from the DOC's general counsel at the time, Brent Warner.  (Peterson Decl. ¶ 16.)  Peterson gave the same narrow interpretation of the *Peterson* decision to his hearing officers.  (*Id.* ¶ 17.)  Staff in the records unit received the same interpretation from Fink and conducted an audit to determine which failure-to-register offenders would be affected and to begin the process of releasing those offenders – fifty in totally – who were eligible for release under *Peterson*.  (Courtney Aff. ¶¶ 13-17.)

## B.    *Cote v. Roy*

In 2011, in an unpublished order opinion, the Minnesota Court of Appeals applied its reasoning in *Peterson* to Minn. Stat. § 609.109, subd. 7 (2002), and its successor statute – the statute at issue in this case: Minn. Stat. § 609.3455, subd. 6 (2005).  *Cote v. Roy*, No. A11-727, at 1 n.1 (Minn. Ct. App. Nov. 15, 2011).[6]  In that case, the defendant had been convicted of third-degree criminal sexual conduct, was sentenced to a term of prison and supervised release, and was also given a ten-year conditional release term under now-Section 609.3455, subd. 6.  *Id.* at 1-2.  Cote breached the conditions of his supervised release, his release was revoked, and he was given enough accountability time to keep him incarcerated beyond the expiration of his supervised release term and into his conditional release term.  *Id.*

---

[6] The *Cote* decision is available in the record.  (*See* Aff. of Scott A. Grosskreutz ("Grosskreutz Aff."), Ex. 2, Oct. 1, 2014, Docket No. 32.)  Citations to the case will refer to the page numbers of the case itself.

Cote sought habeas relief, which the state trial court granted. *Id.* The appellate court affirmed, citing *Peterson*. *Id.* at 4-6. The court noted that *Peterson* involved a different statute, the failure-to-register statute, but it reasoned that the relevant language of both statutes is "nearly identical." *Id.* at 4-5; *compare* Minn. Stat. § 243.166, subd. 5a (2002) ("**[A]fter** the person has completed the sentence imposed, the commissioner shall place the person on conditional release." (emphasis added)), *with* Minn. Stat. § 609.109, subd. 7 (2002) ("**[A]fter** the person has completed the sentence imposed, the commissioner of corrections shall place the person on conditional release." (emphasis added)). The court noted that while there is a difference between the statute in *Peterson* and the statute in *Cote* – namely the language that the conditional release term should be reduced by the length of the supervised release term – the *Peterson* court had expressly rejected that distinction as a reason for its decision. *Id.* at 5-6. As a result, the *Cote* court extended *Peterson* to Minn. Stat. § 609.109, subd. 7 and its successor statute, Minn. Stat. § 609.3455, subd. 6.[7] *Id.* The state petitioned the Minnesota Supreme Court for review of the *Cote* decision, but the court denied the petition. (Aff. of Scott A. Grosskreutz ("Grosskreutz Aff."), Ex. 4 (Minnesota Supreme Court Order) at 17, Oct. 1, 2014, Docket No. 32.)

---

[7] Note that the current versions of the statutes cited in both *Peterson* and *Cote* were amended in 2013 to change the language on which the Minnesota Court of Appeals focused in its decisions. 2013 Minn. Sess. Law. Serv. Ch. 96, §§ 1, 3 (2013) (amending Minn. Stat. §§ 243.166, 609.3455). The current statutes clearly state that the mandatory conditional release term begins after the offender is "released from prison." Minn. Stat. §§ 243.166, subd. 5a, 609.3455, subd. 6.

Following the *Cote* decision, despite the fact that it was not precedential and applied only to the offender in that case, the DOC general counsel[8] decided – as a matter of policy – to apply the case to "all offenders with a conditional-release term imposed for criminal sexual conduct." (Peterson Decl. ¶ 19; *id.*, Ex. 5 at Peterson 3404.) The records unit was involved in the planning and administration of the DOC's plan to implement *Cote*. (Courtney Aff. ¶ 21.) While the agency wanted to move quickly, it took a significant amount of time to plan out its response, both because there were a large amount of affected offenders – potentially thousands – and because the DOC's tracking and calculation system, COMS, was in the midst of a transition and was not initially well-suited for the task of easily tracking down affected offenders. (*Id.* ¶¶ 21-24.) Initially, the records unit responded most quickly to requests from attorneys and offenders themselves, usually through an HRU hearing officer, to make adjustments due to *Peterson* and *Cote*. (*Id.* ¶ 22.) Eventually, by mid-2012, the records unit began a DOC-wide audit of offenders, focused primarily on identifying offenders who were serving accountability time, beyond the end of their supervised release term but during their conditional release term, due to misconduct committed during their supervised release term. (*Id.* ¶ 24.) Once such an offender was identified by records unit staff, the offender's case manager took over and began planning for release immediately. (*Id.*) Records staff also needed to adjust the length of conditional release terms, to reflect the DOC's new interpretation of the statute's requirement that conditional release terms be

---

[8] The records unit contends that it was actually then-Deputy Commissioner of Community Services for the DOC Rich Crawford's decision to apply *Cote* as though it was binding law. (Courtney Aff. ¶ 19.)

decreased by the amount of time an offender spends on supervised release. (*Id.*) The records unit contends that this complicated process was made even more difficult by the fact that some state courts did not agree with the DOC's decision, refused to apply *Cote*, and instead issued conflicting sentencing orders. (*Id.* ¶ 28.) The DOC continues to administer sentences in line with *Peterson* and *Cote* for crimes that were committed before August 1, 2013, when the Minnesota legislature revised the conditional release statutes. (*Id.* ¶¶ 28-29.)

## III.   LOCKHART-BEILKE'S SENTENCE

According to the records unit staff, Lockhart-Beilke entered DOC custody on August 26, 2008, following sentencing, to serve his thirty-eight month executed sentence. (*Id.* ¶ 31.) At the time of entry, his SRD was determined to be August 14, 2009, with his thirty-eight month executed sentenced scheduled to expire on September 3, 2010[9] and his ten-year conditional release term scheduled to end on August 14, 2019. (*Id.*) Lockhart-Beilke was released on intensive supervised release on August 17, 2009. (*Id.*) He was found to have violated the terms of his release in December 2009, by consuming alcohol, and his release conditions were restructured. (Peterson Decl. ¶ 23.)

On October 25, 2010, hearing officer Pung held a revocation hearing for Lockhart-Beilke, due to Lockhart-Beilke's admission to his supervising agent, on October 14, 2010, that he had breached the conditions of his parole by having sexual intercourse with

_____

[9] Lockhart-Beilke is less specific in his calculations, simply speculating that his executed sentence should have ended sometime in early September. (Pl.'s Resp. Mem. at 3, Nov. 7, 2014, Docket No. 37.)

a fifteen-year old female at his home.  (*Id.*; Aff. of Richard S. Pung ("Pung Aff.") ¶ 8, Oct. 1, 2014, Docket No. 28.)  The girl then became pregnant.  (*Id.*)  Pung revoked Lockhart-Beilke's release and extended his PRD by 365 days (i.e., giving him one year of accountability time in prison).  (*Id.*)  He directed Lockhart-Beilke to receive sex offender treatment while incarcerated.  (*Id.*)  Hearing officer Roger Baburam held another review hearing for Lockhart-Beilke on August 8, 2011.  (Aff. of Roger J. Baburam ("Baburam Aff.") ¶ 8, Oct. 1, 2014, Docket No. 31.)  His understanding was that Lockhart-Beilke had failed to request admission to sex offender treatment and, consequently, he extended PRD another 365 days.  (*Id.*)  Lockhart-Beilke appealed the decision to HRU-head Peterson, but Peterson denied the appeal.  (Peterson Decl. ¶ 26.)  It appears that Lockhart-Beilke did not make any arguments regarding the *Peterson* decision at these hearings or during his administrative appeal to Peterson.  (Pung. Aff. ¶¶ 8-9; Baburam Aff. ¶¶ 8-9; Peterson Decl. ¶ 26.)

In June 2012, Lockhart-Beilke, through his attorney, requested an audit of his records in light of *Peterson* and *Cote*.  (Peterson Decl. ¶ 27.)  Fink, in the DOC's counsel's office, investigated and determined that *Peterson* and *Cote* did not apply, because Lockhart-Beilke's misconduct with the fifteen-year old girl had occurred in October 2010, during his conditional release period.  (*Id.*; *id.,* Ex. 10 at Peterson 2788, 2820-21.)  Peterson sent Lockhart-Beilke this information.  (*Id.* ¶ 27.)

Lockhart-Beilke filed a habeas petition in state court on October 1, 2012, seeking relief under *Peterson* and *Cote*.  (Courtney Aff., Ex. 8 at Peterson 1217-30.)  The DOC's counsel again contended, in response, that Lockhart-Beilke's misconduct had occurred up

to and during his conditional release period, so that he was not eligible for release pursuant to *Peterson* and *Cote*.  (Courtney Aff. ¶ 32.)

While the habeas case was ongoing, hearing officer Zachary Gahm conducted another review hearing for Lockhart-Beilke on October 8, 2012.  (Aff. of Zachary Gahm ("Gahm Aff.") ¶ 8, Oct. 1, 2014, Docket No. 29.)  Gahm extended the PRD another 365 days to allow Lockhart-Beilke to complete sex offender treatment.  (*Id.*)  Gahm concedes that Lockhart-Beilke's attorney requested the offender's immediate release, due to *Peterson* and *Cote*, but he contends that the attorney also acknowledged that Lockhart-Beilke had filed a habeas petition and that he had no qualms with letting the court work out Lockhart-Beilke's case.  (*Id.* ¶¶ 8-9.)

The Minnesota Appellate Public Defender appealed Gahm's decision within the HRU and Peterson denied the appeal, citing the earlier audit, performed by Fink, into Lockhart-Beilke's allegations.  (Peterson Decl. ¶ 28.)  The state court, in Anoka County, granted the habeas petition on March 28, 2013 and ordered Lockhart-Beilke released.  (Courtney Aff., Ex. 8 at Peterson 3917-24.)  The court concluded that there was little evidence that Lockhart-Beilke violated the terms of his release in the fall of 2010, into his conditional release period.  (*Id.* at Peterson 3923.)  As a result, the hearing officer had no factual basis to find that Lockhart-Beilke had violated his conditional release.  (*Id.*)  Lockhart-Beilke could, consequently, receive the benefit of the *Peterson* and *Cote* decisions.  (*Id.*)  Lockhart-Beilke was released on April 10, 2013.  (Courtney Aff. ¶ 32.)

## IV.    THIS CASE

Lockhart-Beilke filed a complaint in this case on May 20, 2013.   (Compl., May 20, 2013).   In it, he sues Peterson, Pung, Baburam, and Gahm, along with all hearing officers in the HRU generally, in their personal capacities, seeking damages. (*Id.*; *see also id.* ¶¶ 64-68.)   In Count I, under 42 U.S.C. § 1983, he alleges a violation of his Eighth Amendment right to be free from cruel and unusual punishment by holding him beyond the end of his lawful term of imprisonment.  (*Id.* ¶¶ 47-52.)   In Count II, also under Section 1983, he alleges a violation of his due process rights under the Fifth Amendment to the U.S. Constitution.   (*Id.* ¶¶ 53-58.)   In Count III, he alleges false imprisonment under state common law.   (*Id.* ¶¶ 59-63.)   The defendants moved for summary judgment on October 1, 2014.   (Mot. for Summ. J., Oct. 1, 2014, Docket No. 24.)

## DISCUSSION

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).   A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all

reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U .S. 574, 587 (1986).

## II.   FEDERAL CLAIMS

In Counts I and II of his complaint, Lockhart-Beilke asserts constitutional claims under 42 U.S.C. § 1983, alleging violations of his Eighth Amendment right not to be unlawfully imprisoned and his Fifth Amendment due process rights.[10]   (Compl. ¶¶ 47-58.)  Courts analyze Eighth and Fourteenth Amendment claims in the false imprisonment context the same way. *See Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013); *cf. Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007).  Under both amendments, Lockhart-Beilke "had a clearly established right to be free from wrongful, prolonged incarceration." *Scott*, 720 F.3d at 1036 (internal quotation marks omitted).  The scope of that right in this case, however – namely the legality of Lockhart-Beilke's incarceration during his **conditional** release period, for a wrong that may have occurred only during his **supervised** release period – is a question of state law. *Cf. Swarthout v. Cooke*, 131 S. Ct. 859, 862 (2011) ("Whatever liberty interest exists [in parole] is, of course, a **state** interest created by [state] law.   There is no right under the Federal Constitution to be

---

[10]   The defendants contend that the Court should dismiss Lockhart-Beilke's Fifth Amendment claims in Count II because the Fifth Amendment applies only to federal actors. *Barnes v. City of Omaha*, 574 F.3d 1003, 1005 n.2 (8th Cir. 2009) ("The Fifth Amendment's Due Process Clause applies only to the federal government or federal actions . . . .").  The defendants are correct that the Fifth Amendment applies only against the federal government, but the Court will not rely on this ground to dismiss Count II.   The complaint explicitly references the Fourteenth Amendment, noting that the Fifth Amendment is made applicable to the states via the Fourteenth Amendment.   (Compl. ¶ 54.); *see Knutson v. City of Fargo*, 600 F.3d 992, 999 n.5 (8th Cir. 2010).  That reference is sufficient to make clear that the complaint is asserting its due process claims via the Fourteenth Amendment.

conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners."); *Carrillo v. Fabian*, 701 N.W.2d 763, 773 (Minn. 2005) ("[W]e hold that under the Due Process Clause of the United States Constitution, [the petitioner] has a protected liberty interest in his supervised release date that triggers a right to procedural due process before that date can be extended.").

The defendants argue that qualified immunity protects them from this action. Qualified immunity "shields public officials from § 1983 damage actions if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Scott*, 720 F.3d at 1036 (internal quotation marks omitted). The first step in the two-step qualified immunity analysis is to determine whether the facts show that the "officer's conduct violated a constitutional right." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (internal quotation marks omitted).

The second step is to decide "whether the constitutional right alleged to have been violated was clearly established." *Id.* at 719. "In order for a right to be clearly established, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'" *Id.* (quoting *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989)). "In other words, a constitutional right is clearly established when it would be clear to a reasonable officer that his [or her] conduct was unlawful in the situation he [or she] confronted." *Id.* (internal quotation marks omitted). Due to the doctrine of qualified immunity, officials are not liable under Section 1983 for "bad guesses in gray areas; they are liable for transgressing bright lines." *Scott*, 720 F.3d at 1036 (internal quotation marks omitted).

- 17 -

The Supreme Court has clarified that a district court need not engage in both steps of the qualified-immunity analysis, and need not engage in the steps in a specific order, if the case can be resolved on one step or the other alone. *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009) ("There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.").

Assuming, without deciding, that Lockhart-Beilke's rights were violated, the Court will nevertheless grant the defendants' motion for summary judgment because Lockhart-Beilke's rights were not clearly established. In other words, the defendants were operating in a "gray area[]" and did not cross a "bright line." *Scott*, 720 F.3d at 1036. First, Lockhart-Beilke's rights were obviously not clearly established when Pung and Baburam interacted with his case. They held hearings in this case in October 2010 and August 2011, respectively. These hearings both preceded the Minnesota Court of Appeals' decision in *Cote v. Roy*, which was the first case to conclude that a person like Lockhart-Beilke, guilty of criminal sexual conduct – as opposed to failing to register as a sex offender, which the court considered in *Peterson*, 784 N.W.2d at 846 – could not be incarcerated beyond the end of the supervised release term imposed. *Cote*, No. A11-727, at 4-6. Indeed, the DOC did not make the decision to apply its new post-*Peterson* sentencing policy to criminal sexual conduct offenders until after *Cote* was decided. (Peterson Decl. ¶ 19.)

It is true that language in the *Peterson* decision, and similarities between the failure to register statute and the criminal sexual conduct statute led to the court's decision in *Cote*. But the decision in *Peterson* still represented a shift from past decisions

in *Enger* and *Koperski*.  *Peterson*, 784 N.W.2d at 846-47.  To attempt – as Lockhart-Beilke does – to extend the change in the law enunciated in *Peterson* to other criminal statutes, before the court addressed those statutes and while the law in that area is in flux, is to push too far the boundaries of what law is "clearly established."  Whatever clues might be found in the *Peterson* decision's reasoning, it was not enough to mark a change in the law surrounding sentencing for criminal sexual conduct, such that Lockhart-Beilke's rights in his hearings with Pung and Baburam were clearly established.

The issue is a somewhat closer one as to Peterson and Gahm, both of whom rejected Lockhart-Beilke's attempts to obtain release pursuant to *Peterson* and *Cote*, after *Cote* was decided.  Unlike a case in which corrections officers reject or delay a petitioner's attempt to gain release, despite an explicit court order, *see Scott*, 720 F.3d at 1036-37 (contrasting the *Scott* case from the *Davis* case, in which "some state DOC defendants were denied qualified immunity because they knew a court order directed immediate release, but detained the inmate another 57 days"), here Peterson and Gahm had no such court order.  Peterson and Gahm relied on the analysis of DOC attorney Fink, who determined that Lockhart-Beilke's misconduct had occurred during both his supervised release and conditional release periods and, consequently, that he did not benefit from *Peterson* and *Cote*.  (Peterson Decl., Ex. 10 at Peterson 2788, 2820-21.)  As a result, it would not have been clear to a reasonable officer in Peterson's or Gahm's position "'that his [or her] conduct was unlawful **in the situation he [or she] confronted**.'"  *Harris v. Hammon*, 914 F. Supp. 2d 1026, 1038 (D. Minn. 2012) (emphasis added) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)); *see also*

*Watertown Equip. Co. v. Nw. Bank Watertown*, 830 F.2d 1487, 1495 (8th Cir. 1987) ("This Court has also recognized that although reliance on the advice of counsel alone will not satisfy an official's burden of acting reasonably, it may be a factor which bears on the question of qualified immunity.")

Moreover, the state of the law at the time of Peterson's and Gahm's interactions with Lockhart-Beilke was anything but clear.  Instead, the law surrounding the complex relationship between supervised release periods and conditional release periods was in flux – a gray area void of the "bright lines" that might eliminate Peterson's and Gahm's protection under the qualified immunity doctrine.  *Scott*, 720 F.3d at 1036.  *Peterson* represented a shift from *Enger* and *Koperski*, changing to some extent the legal landscape surrounding supervised and conditional release and the DOC's understanding of how to calculate sentences.  *Peterson*, 784 N.W.2d at 846-48; (Peterson Decl. ¶¶ 16-19; Courtney Aff. ¶¶ 13-15, 18-20.).  *Cote*, the decision that is explicitly on point and that helps clarify the effect of *Peterson* on criminal sexual conduct defendants, is an unpublished, non-precedential order.  *Cote*, No. A11-727, at 8.  It is true that the DOC decided to change its policies following *Cote*, but it did so as a policy decision, not because *Cote* – which was non-binding – clearly established a new right.  (Peterson Decl., Ex. 5 at Peterson 3404.)  Indeed, at least one subsequent state trial court decision stated that, following the *Peterson* decision, this area of the law consists of "evolving (and at times perplexing) Court of Appeals decisions."  (Grosskreutz Aff., Ex. 8 at Peterson 5006-15 (*Belt v. Roy*, No. 82-CV-13-3110 (Minn. Dist. Ct. Aug. 2, 2013)).)

Even more proof of the fluctuating nature of this area of the law is the evolving series of decisions considering the related issue of how to calculate, under *Koperski*, how supervised release time should be deducted from a conditional release term (i.e., should time spent in the community on supervised release be the only time that is deducted, or should time spent back in prison due to the revocation of supervised release also count). *Compare Schnagl*, 2013 WL 6152348, at *4-*5 ("Thus, we conclude that appellant is not entitled to credit against his conditional-release period for the time he spent incarcerated on violations of his supervised-release term."), *aff'd as modified by* 859 N.W.2d 297 (Minn. 2015), *and State v. Ward*, 847 N.W.2d 29, 34 (Minn. Ct. App. 2014) (concluding that an "inmate's conditional release should not be reduced by the time spent in custody after [supervised release] revocation"), *review granted* (Minn. June 17, 2014), *with* (Grosskreutz Aff., Ex. 6 at Peterson 3877 (*State v. Jones*, No. 27-CR-03-71227 (Minn. Dist. Ct. Dec. 18, 2012)) ("The Court agrees with Defendant that . . . his entire supervised release time (whether he was in or out of prison during that period) must be deducted from his conditional release period.").). Indeed, the Eighth Circuit has stated that "[w]here courts are uncertain of the parameters of a right, no reasonable public official can be expected to know that a clearly established constitutional right is being violated." *Vieira v. Presley*, 988 F.2d 850, 853 n.4 (8th Cir. 1993).

The state legislature has kept the law in this area in flux as well. Following the decisions in *Peterson* and *Cote*, the state legislature changed the relevant failure-to-register and criminal sexual conduct laws to state that a mandatory conditional release term starts after an offender is "released from prison," not following the end of a

supervised release term.   Minn. Stat. § 243.166, subd. 5a; Minn. Stat. § 609.3455, subd. 6; (Courtney Aff. ¶ 29.).   The legislature also deleted the phrase "minus the time the offender served on supervised release."   2013 Minn. Sess. Law. Serv. Ch. 96, § 3 (2013).

In sum, the Court concludes that because this area of the law in Minnesota is still in flux, it was not clearly established that the defendants were violating Lockhart-Beilke's Eighth and Fourteenth Amendment rights.   While it is true that this circuit takes a relatively broad view of what constitutes clearly established law, *Hayes v. Long*, 72 F.3d 70, 73-74 (8th Cir. 1995) ("In order to determine whether a right is clearly established . . . a court should look to all available decisional law including decisions of state courts, other circuits and district courts" (quoting *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 291 (8th Cir. 1993)), courts generally have looked to **multiple** clear statements of the law, either in statute or in case law, to conclude that a law is clearly established.   *Stoner v. Watlingten*, 735 F.3d 799, 804 (8th Cir. 2013) (concluding a right was clearly established where the state supreme court had stated as much on "at least three occasions"); *see also Kahle v. Leonard*, 477 F.3d 544, 554 (8th Cir. 2007) (holding that a right was clearly established and summarizing various court decisions that had stated as much, explicitly).   Here, there is only one state appellate court decision that is directly on point, that decision is non-precedential, and the entire area of the law is in flux, with the Supreme Court possibly weighing in on a related issue and the legislature

making statutory changes.  The law is not clearly established.[11]  Consequently, the Court will grant the defendants' motion for summary judgment as to all defendants on Lockhart-Beilke's federal claims and will dismiss with prejudice Counts I and II of his complaint.

## III.    STATE LAW CLAIMS

Lockhart-Beilke alleges in Count III a violation of his state common law right to be free of false imprisonment.  (Compl. ¶¶ 59-63.)  False imprisonment in Minnesota requires "(1) words or acts intended to confine, (2) actual confinement, and (3) awareness by the plaintiff that he is confined."  *Blaz v. Molin Concrete Prods. Co.*, 244 N.W.2d 277, 279 (Minn. 1976).

The defendants argue, however, that the Court should decline to exercise supplemental jurisdiction over Lockhart-Beilke's state law claims.  *See Cooke v. Peterson*, No. 12-1587, 2012 WL 6061724, at *2 (D. Minn. Dec. 6, 2012) (in a case involving similar allegations against many of the same defendants, declining to exercise supplemental jurisdiction over state law claims after dismissing federal law claims). Because the Court will grant summary judgment to the defendants on Lockhart-Beilke's federal law claims, and dismiss those claims, the Court will also exercise its discretion under 28 U.S.C. § 1367(c) to "dismiss supplemental state law claims when all federal

---

[11] Lockhart-Beilke filed an affidavit and additional record materials on January 19, 2015. (Second Aff. of A.L. Brown, Jan. 19, 2015, Docket No. 47.)  The defendants have asked the Court not to consider those materials.  (Letter to District Judge, Jan. 28, 2015, Docket No. 48.) Even considering those additional materials, the Court still concludes that the law in this case was not clearly established and that the defendants are entitled to qualified immunity.

claims have been dismissed." *Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006); *see also Stokes v. Lokken*, 644 F.2d 779, 785 (8th Cir. 1981) ("[W]hen federal claims are dismissed before trial, the normal practice is to dismiss pendent [state law] claims."), *overruled on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988); *Magee v. Hamline Univ.*, 1 F. Supp. 3d 967, 977-78 (D. Minn. 2014) ("Courts should 'exercise judicial restraint and avoid state law issues wherever possible.'" (quoting *Thomas v. Dickel*, 213 F.3d 1023, 1026 (8th Cir. 2000))).

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The defendants' motion for summary judgment [Docket No. 24] is **GRANTED**.

2.      Lockhart-Beilke's federal law claims – Counts I and II of his complaint – are **dismissed with prejudice**.

3.      Lockhart-Beilke's state law claims – Count III of his complaint – are **dismissed without prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:   September 29, 2015
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge